**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| CHURCH MUTUAL INSURANCE COMPANY, NOW KNOWN AS CHURCH MUTUAL INSURANCE COMPANY, S.I., | Case No.23-cv-164 |
| | Judge: _____ |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| FRONTIER MANAGEMENT, LLC; WELLTOWER TENANT GROUP, LLC d/b/a THE AUBERGE AT ORCHARD PARK; and CHARLES NEDOSS, INDEPENDENT EXECUTOR OF THE ESTATE OF BERTRAND NEDOSS, DECEASED, | |
| Defendants. | |

## <u>COMPLAINT FOR DECLARATORY JUDGMENT</u>

Plaintiff CHURCH MUTUAL INSURANCE COMPANY, NOW KNOWN AS CHURCH MUTUAL INSURANCE COMPANY, S.I., by and through their attorneys, MEAGHER & GEER, P.L.L.P., state the following as its Complaint for Declaratory Judgment, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, against Defendants, FRONTIER MANAGEMENT, LLC, WELLTOWER TENANT GROUP, LLC d/b/a THE AUBERGE AT ORCHARD PARK, and CHARLES NEDOSS, INDEPENDENT EXECUTOR OF THE ESTATE OF BERTRAND NEDOSS, DECEASED:

### <u>NATURE OF THE ACTION</u>

1.     This is an action brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 to obtain a declaration of the rights and obligations under a commercial liability insurance policy that was issued by Plaintiff to Frontier Management.

2.     Plaintiff seeks a declaration from this Court that it owes no obligation under its policy to defend and/or to indemnify Frontier Management, LLC and Welltower Tenant Group, LLC, d/b/a Auberge At Orchard Park for the allegations directed against it in the Complaint captioned *Charles Nedoss, Independent Executor Of The Estate Of Bertrand Nedoss, Deceased v. Welltower Tenant Group, LLC d/b/a Auberge at Orchard Park and Frontier Management, LLC*, Court File No. 2021L010170, venued in the Circuit Court of Cook County, Illinois ("the underlying lawsuit"). A copy of the Complaint at Law in the underlying lawsuit is attached as **Exhibit 1**.

## PARTIES

3.     Plaintiff Church Mutual Insurance Company, now known as Church Mutual Insurance Company, S.I. ("Church Mutual") is a Wisconsin citizen incorporated under the laws of the State of Wisconsin with its principal place of business in Wisconsin. At all relevant times mentioned herein, Church Mutual was authorized to issue policies of insurance in the state of Illinois.

4.     Upon information and belief, Defendant Frontier Management, LLC ("Frontier"), at all relevant times mentioned herein, was a limited liability company duly organized and operating under the laws of the State of Oregon, with its principal place of business in Portland, Oregon, but duly qualified and authorized to do business, and doing business, in the State of Illinois. Upon information and belief, and pursuant to examination of publicly available documents from the Oregon Secretary of State including the Articles of Organization and most recent Annual Report for this entity, **attached as Exhibits 2 and 3**, its member is a citizen of the State of Oregon.

5.     Upon information and belief, Defendant Welltower Tenant Group, LLC d/b/a The Auberge at Orchard Park ("Welltower" or "Auberge"), at all relevant times mentioned herein,

pursuant to examination of documents available from the Delaware Secretary of State including the Certificate of Formation for this entity, attached as **Exhibit 4**, was a limited liability company duly organized and operating under the laws of the State of Delaware, and pursuant to publicly available documents from the Illinois Secretary of State including entity information for this entity, attached as **Exhibit 5**, had its principal place of business in Toledo, Ohio, but duly qualified and authorized to do business, and doing business, in the State of Illinois. Upon information and belief, Welltower Tenant Group, LLC operates under assumed name The Auberge at Orchard Park. (Ex. 5, p.2). Upon information and belief, at all relevant times mentioned herein, The Auberge at Orchard Park was a senior living facility located in Morton Grove, Illinois.

6.      Upon information and belief, Defendant Charles Nedoss, Independent Executor of the Estate of Bertrand Nedoss ("Nedoss"), at all times relevant herein was, and is a citizen of the State of Illinois. Plaintiff names Nedoss as a potentially interested party by virtue of his status as a named plaintiff in the underlying lawsuit. No affirmative relief is sought against Nedoss.

## JURISDCITION AND VENUE

7.      This Court has jurisdiction over this action under 28 U.S.C. § 1332 (a)(1), because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is a dispute between citizens of different states.

8.      Venue is appropriate under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to this lawsuit occurred in the Northern District of Illinois, where the underlying lawsuit is pending, and where the subject policies were issued.

9.      An actual justiciable controversy exists between Church Mutual, on the one hand, and Frontier, Welltower, and Auberge, on the other hand, and by the terms and provisions of Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 this Court is invested with

the power to declare the rights and liabilities of the parties hereto and to grant such relief as it deems necessary and proper.

## THE UNDERLYING LAWSUIT

10.     Prior to filing a lawsuit, the Nedoss family retained an attorney and on January 14, 2021, the attorney sent Auberge a notice of attorneys' lien and demand to preserve evidence letter.

11.     The January 2021 letter submitted to Church Mutual does not make a monetary demand.

12.     In response to that January 2021 letter, out of an abundance of caution, Church Mutual retained defense counsel on behalf of Auberge to investigate and respond to Nedoss' attorney's records request.

13.     On October 15, 2021, Charles Nedoss as the independent executor of the estate of Bertrand Nedoss, filed the underlying lawsuit, which is currently pending in Cook County, Illinois.

14.     The underlying lawsuit names Welltower Tenant Group, LLC d/b/a Auberge at Orchard Park ("Welltower" or "Auberge") and Frontier Management, LLC ("Frontier") as defendants.

15.     The underlying lawsuit alleges Auberge is an assisted living facility located in Illinois, which provided services to residents that includes assistance with activities of daily living.

16.     The underlying lawsuit alleges Auberge was an assisted living facility as defined by 210 ILCS 9/1 *et seq.*, the Assisted Living and Shared Housing Act.

17.     The underlying lawsuit alleges Frontier owned, operated, and managed the Auberge facility and exercised control over the day to day facility operations including marketing, finances, staffing, training, contracting, monitoring quality of care, and establishing policies and procedures.

18.     The underlying lawsuit alleges Welltower owned, operated, managed, and was the licensee of Auberge pursuant to 210 ILCS 9/10 of the Assisted Living and Shared Housing Act and 77 Illinois Administrative Code, Chapter I § 295.200.

19.     The underlying lawsuit alleges Bertrand Nedoss was an Auberge resident from July 18, 2017 through January 5, 2021.

20.     The underlying lawsuit alleges that in December 2020 Bertrand Nedoss drank COVID-19 sample solution, which resulted in the development of pneumonia.

21.     The underlying lawsuit alleges on January 5, 2021, Auberge resident Bertrand Nedoss eloped from the facility, which resulted in his hypothermia, cardiac arrest, and death.

22.     The underlying lawsuit alleges a survival action pursuant to 755 ILCS 5/27-6, and a wrongful death action pursuant to 740 ILCS 180/1 *et seq.*, against both Frontier and also against Welltower and Auberge.

23.     The underlying lawsuit's survival action against Frontier alleges the Auberge facility held itself out as providing dementia services including supervision with daily activities, that Bertrand Nedoss and his family relied on those representations, that Frontier, by and through its employees and agents, was aware of Bertrand Nedoss' elopement risk and knew or should have known that Bertrand Nedoss required supervision to prevent elopement from Auberge.

24.     The underlying lawsuit's survival action against Frontier alleges that on January 28, 2021, the Illinois Department of Public Health found Auberge in violation of 77 Illinois Administrative Code, Chapter I, § 295.4010 and § 295.6000 regarding the care of Bertrand Nedoss.

25.     The underlying lawsuit's survival action against Frontier alleges it had a duty, by and through its agents and employees, to exercise reasonable care in the ownership, operation, and management of Auberge.

26.     The underlying lawsuit's survival action against Frontier alleges Frontier was negligent by one or more of the following acts or omissions:

        a)  Failed to provide enough staff to the Facility in order to provide appropriate supervision of residents to prevent elopements;

        b)  Failed to provide properly working alarming devices to the Facility to prevent resident elopements;

        c)  Failed to see that that Facility staff was properly trained to prevent resident elopements;

        d)  Failed to see that the Facility had a proper system in place to prevent resident elopements;

        e)  Failed see that the Facility was operating in compliance with the Federal and State Regulations;

        f)  Failed see that the Facility's policies and procedures were properly implemented and being followed; and

        g)  Improperly marketed the Facility as being able to provide care that it was not able to provide.

(Ex. 1 at Count III, ¶ 24).

27.     The underlying lawsuit's survival action against Frontier alleges as a direct and proximate cause of Frontier's negligent acts or omissions, Bertrand Nedoss drank COVID-19 sample solution, which led to his pneumonia in December 2020, and eloped from the Auberge facility on January 5, 2021, which resulted in his death.

28.     The underlying lawsuit's survival action against Frontier seeks in excess of $50,000.00.

29.     The underlying lawsuit's survival action against Welltower and Auberge alleges the Auberge facility held itself out as providing dementia services including supervision with daily

6

activities, that Bertrand Nedoss and his family relied on those representations, that Auberge, by and through its employees and agents, were aware of Bertrand Nedoss' elopement risk and knew or should have known that Bertrand Nedoss required supervision to prevent elopement from Auberge.

30.     The underlying lawsuit's survival action against Welltower and Auberge alleges that under 210 ILCS 9/95(9) and 77 Illinois Administrative Code, Chapter I § 295.6000(a)(13), Auberge resident Bertrand Nedoss had a right to be free from neglect.

31.     The underlying lawsuit's survival action against Welltower and Auberge alleges that on January 28, 2021, the Illinois Department of Public Health found Auberge in violation of 77 Illinois Administrative Code, Chapter I, § 295.4010 and § 295.6000 regarding the care of Bertrand Nedoss.

32.     The underlying lawsuit's survival action against Welltower and Auberge alleges it had a duty, by and through its agents and employees, to exercise reasonable care in administering Bertrand Nedoss' care, treatment, and supervision.

33.     The underlying lawsuit's survival action against Welltower and Auberge alleges Auberge, by and through its employees and agents, was negligent by the following statutory violations and negligent acts or omissions:

> a) Failed to appropriately assess [Bertrand Nedoss'] risk for elopement;
>
> b) Failed to appropriately develop an individualized service plan to address [Bertrand Nedoss'] risk for elopement;
>
> c) Failed to appropriately implement an individualized service plan to address [Bertrand Nedoss'] risk for elopement;
>
> d) Failed to provide [Bertrand Nedoss] with appropriate supervision;
>
> e) Failed to keep [Bertrand Nedoss'] environment free of accident hazards;

f) Failed to prevent [Bertrand Nedoss] from ingesting COVID sample solution on December 7, 2020;

g) Failed to store COVID sample solution in a secure place;

h) Failed to prevent [Bertrand Nedoss] from eloping from the facility on January 5, 2021;

i) Failed to follow the Facility's elopement procedures;

j) In violation of 210 ILCS 9/15 and 77 Illinois Administrative Code, Chapter I §295.4010, failed to conduct hourly checks on [Bertrand Nedoss] as outlined in his service plan;

k) In violation of 210 ILCS 9/15 and 77 Illinois Administrative Code, Chapter I §295.4010, failed to respond in a timely manner to an egress door alarm and bed alarm;

l) In violation of 210 ILCS 9/150(f)(3), failed to develop and implement policies and procedures to ensure the safety of [Bertrand Nedoss] while he as a resident at the Facility;

m) In violation of 210 ILCS 9/150(f)(6) and 77 Illinois Administrative Code, Chapter I §295.3000(a), failed to provide an appropriate number of trained staff to keep [Bertrand Nedoss] safe and free from injuries;

n) In violation of 210 ILCS 9/150(b) and 77 Illinois Administrative Code, Chapter I §295.2000(a), kept [Bertrand Nedoss] at the Facility and reassured her family that they could meet her needs, despite not being licensed to or being able to provide the level of care she required; and

o) In violation of 210 ILCS 9/95(9) and 77 Illinois Administrative Code, Chapter 1 §295.6000(a)(13), failed to keep [Bertrand Nedoss] free from neglect.

(Ex. 1 at Count I, ¶ 26).

34. The underlying lawsuit's survival action against Welltower and Auberge alleges as a direct and proximate cause of Auberge's negligent acts or omissions, Bertrand Nedoss drank COVID-19 sample solution, which led to his pneumonia in December 2020, and eloped from the Auberge facility on January 5, 2021, which resulted in his death.

35. The underlying lawsuit's survival action against Welltower and Auberge seeks in excess of $50,000.00.

36.    The underlying lawsuit's wrongful death action against Frontier alleges Bertrand Nedoss left surviving individuals who were his next of kin, including his sons and daughter, whom suffered injuries as a result of Bertrand Nedoss' death, including loss of companionship, grief, and sorrow.

37.    The underlying lawsuit's wrongful death action against Frontier alleges Bertrand Nedoss' estate was diminished due to his medical, hospital, and funeral expenses.

38.    The underlying lawsuit's wrongful death action against Frontier seeks in excess of $50,000.00.

39.    The underlying lawsuit's wrongful death action against Welltower and Auberge alleges Bertrand Nedoss left surviving individuals who were his next of kin, including his sons and daughter, whom suffered injuries as a result of Bertrand Nedoss' death, including loss of companionship, grief, and sorrow.

40.    The underlying lawsuit's wrongful death action against Welltower and Auberge alleges Bertrand Nedoss' estate was diminished due to his medical, hospital, and funeral expenses.

41.    The underlying lawsuit's wrongful death action against Welltower and Auberge seeks in excess of $50,000.00.

## CHURCH MUTUAL'S RESERVATION OF RIGHTS

42.    Following receipt of the underlying lawsuit, by letter dated January 20, 2022, Church Mutual agreed to defend Frontier Management and Welltower Tenant Group, LLC d/b/a Auberge at Orchard Park in the lawsuit under a complete reservation of rights under only the Church Mutual policy's Professional Liability Coverage Part ("PLCP"), which defense under reservation would be provided in cooperation with other insurers providing a defense under a

reservation of rights, asserting the right to reimbursement of defense costs and the right to start a declaratory judgment action.

43.  Church Mutual's January 20, 2022 letter stated the underlying lawsuit was likely not covered under the PLCP because the lawsuit was not filed until after the policy expired, and the January 2021 letter (*See supra*, ¶¶ 10-12) was not a "claim" within the meaning of the PLCP.

44.  Following Church Mutual's January 20, 2022 letter, on February 16, 2022 Frontier's third-party administrator at Sedgwick Claims Management Services, Inc. ("Sedgwick") stated the insured had a self-insured retention ("SIR") and was paying defense costs subject to that SIR, and that Everest Insurance is the insurer excess to the SIR.

45.  Upon information and belief, the policy subsequent to the Church Mutual policy and in effect at the time the October 15, 2021 lawsuit was filed is a policy issued by Everest Indemnity Insurance Company to named insured Welltower Inc., which contained a $1,000,000 each claim professional liability retention.

46.  On May 10, 2022, Church Mutual wrote to Frontier, Sedgewick, and Marsh McLennan and asked for clarification regarding the insured's SIR and the subsequent carrier to the Church Mutual policy, which is believed to be Everest Insurance. The May 10, 2022 letter requested confirmation that Frontier was handling the underlying lawsuit as a covered claim under its SIR and whether Everest Insurance was treating this as a covered claim, and in that case, Church Mutual would withdraw from the defense and pay its share of defense costs from the date of tender through May 2022. The May 10, 2022 letter stated that if Frontier was not handling this claim under its SIR and/or Everest Insurance was not treating the underlying lawsuit as a covered claim, but rather took the position the Church Mutual policy applies, Church Mutual would file a declaratory judgment action.

47.     On August 29, 2022, following no response to its May 10, 2022 letter, Church Mutual again wrote to Frontier, Sedgewick, and Marsh McLennan regarding whether Frontier and Everest were treating the underlying lawsuit as a covered claim. Church Mutual reiterated that it would reimburse half of the defense costs incurred from tender through May 2022 and requested defense fee statements for review and payment.

48.     On September 13, 2022, in response to a settlement demand in the underlying lawsuit and still with no response to its May 10, 2022 and August 29, 2022 letters, Church Mutual wrote to Frontier, Sedgewick, and Marsh McLennan regarding the lack of response and asked whether Frontier and Everest were responding to the settlement demand in the underlying case. On that same day, and for the first time, Sedgewick informed Church Mutual that Frontier had retained coverage counsel.

49.     On October 6, 2022, coverage counsel for Frontier responded to Church Mutual's January 20, 2022 letter and demanded Church Mutual amend its coverage position to provide full defense and indemnity under the terms of the Church Mutual policy.

50.     In response, on December 13, 2022, Church Mutual agreed to pay one-hundred percent of defense costs under reservation of rights asserting the right to reimbursement of defense costs and the right to start a declaratory judgment action.

## THE CHURCH MUTUAL PRIMARY POLICY

51.     Church Mutual issued claims-made primary policy No. 0364899-02-129296, effective July 1, 2020 to July 1, 2021 to Frontier Management located at 1651 Richfield Road, Highland Park, Illinois ("primary policy"). A true and correct copy of the primary policy is attached as **Exhibit 6**.

52. Form UN-412 (06-86) Change Endorsement additionally lists The Auberge at Orchard Park and Welltower Tenant Group LLC as named insureds.

53. Form A 001 CD (10-99) – IL states the named insured is an assisted living facility and lists the following relevant policy coverage part: Professional Liability Coverage Part ("PLCP").

**Claims-made Professional Liability Coverage Part**

54. The claims-made PLCP contains a senior living facility professional liability coverage form, which includes a $1,000,000 each claim limit and a $3,000,000 each aggregate limit.

55. The PLCP retroactive date is 7/1/19.

56. Form UN-412 (06-86) Change Endorsement states the Auberge at Orchard Park has a professional liability retroactive date of 7/1/19.

57. In pertinent part, the PLCP states:

**A 503.1 SL (03-06)**

**SENIOR LIVING FACILITY PROFESSIONAL LIABILITY COVERAGE FORM**

Your Senior Living Facility Professional Liability Coverage Form is Claims-Made Coverage. Please read the entire policy carefully.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations Page. The words "we," "us," and "our" refer to Church Mutual Insurance Company.

The word "insured" means any person or organization qualifying as an insured. Refer to Paragraph C - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Paragraph G - Definitions.

**A. SENIOR LIVING FACILITY PROFESSIONAL LIABILITY COVERAGE**

1. Insuring Agreement.

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of injury to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for injury to which this insurance does not apply. We may, at our discretion, investigate any "professional health care incident" and settle any "claim" or "suit" that may result. But:

      (1) The amount we will pay for damages is limited. Refer to Paragraph D - Limits of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under this Senior Living Facility Professional Liability Coverage.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

   b. This insurance applies to injury only if:

      (1) The injury is caused by a "professional health care incident" that takes place in the "coverage territory"; and

      (2) The "professional health care incident" did not occur before the Retroactive Date shown in the Declarations Page or after the end of the policy period; and

      (3) A "claim" for damages, with respect to the injury, is first made against any insured, in accordance with Paragraph c. below, during the policy period or an Extended Reporting Period we provide in accordance with Paragraph F. Extended Reporting Periods.

   c. A "claim" shall be considered to be first made at the earlier of the following times:

      (1) When notice of such "claim" is received by any insured or reported to us in writing; or

   d. All "claims" made by the same person and arising out of the same "professional health care incident" will be deemed to have been

13

made at the time the first of those "claims" is made against any insured.

2. Exclusions.

This insurance does not apply to:

****

b. Injury for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. But this exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

****

## B. SUPPLEMENTARY PAYMENTS - SENIOR LIVING FACILITY PROFESSIONAL LIABILITY COVERAGE

1. We will pay, with respect to any "claim" or "suit" we defend:

   a. All expenses we incur.

   b. The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.

   c. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit," including actual loss of earnings up to $250 a day because of time off from work.

   d. All costs taxed against the insured in the "suit." For the purpose of this provision, costs do not include prejudgment interest or post judgement interest.

   e. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   f. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

These payments will not reduce the Limits of Insurance.

14

**C. WHO IS AN INSURED**

****

    c.  A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

****

**D. LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations Page and the rules below fix the most we will pay regardless of the number of:

    a.  Insureds;

    b.  "Claims" made or "suits" brought; or

    c.  Persons or organizations making "claims" or bringing "suits."

2. The Senior Living Facility Professional Liability Aggregate Limit is the most we will pay for the sum of all damages because of injury included under this Senior Living Facility Professional Liability Coverage.

3. Subject to 2. above, the Senior Living Facility Professional Liability Each Claim Limit is the most we will pay for all damages because of injury arising out of the same "professional health care incident" regardless of the time period over which injuries occur.

    The Limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations Page, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**E. SENIOR LIVING FACILITY PROFESSIONAL LIABILITY CONDITIONS**

****

2. Duties in the Event of any "Professional Health Care Incident," "Claim," or "Suit."

15

a. You must see to it that we are notified as soon as practicable of any "professional health care incident" which may result in a "claim." To the extent possible, notice should include:

(1) How, when and where the "professional health care incident" took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature of the injury arising out of the "professional health care incident."

Notice of a "professional health care incident", is not notice of a "claim."

b. If a "claim" is received by any insured, you must:

(1) Immediately record the specifics of the "claim" or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the "claim" or "suit."

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation, settlement or defense of the "claim" or "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization, which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

****

4. Other Insurance.

If other valid and collectible insurance is available to the insured for a loss we cover under the Senior Living Facility Professional Liability Coverage of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary. When this insurance is primary, our obligations are not affected unless any other insurers' insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Declarations Page of this insurance and applies to injury on other than a claims-made basis, if:

(1) No Retroactive Date is shown in the Declarations Page of this insurance; or

(2) The other insurance has a policy period which continues after the Retroactive Date shown in the Declarations Page of this insurance.

When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay, up to the applicable limits of insurance, the amount of the loss that exceeds the sum of the total amount that all such other insurance would pay for the loss in the absence of this insurance.

If other insurance is also excess, we will share the remaining loss with that other insurance by the method described in c, below.

c. Method of Sharing

If all the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable Limit of Insurance or none of the loss remains, whichever comes first.

17

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable Limit of Insurance to the total applicable Limits of Insurance of all insurers.

****

7.  Separation of Insureds.

    Except with respect to the Limits of Insurance and any rights or duties specifically assigned to the first Named Insured, this insurance applies:

    a.  As if each Named Insured were the only Named Insured; and

    b.  Separately to each insured against whom "claim" is made or "suit" is brought.

****

9.  Two or More Coverages.

    If two or more coverages of this policy apply to the same loss, the maximum amount we will pay as damages under all the coverages will not exceed the highest Limit of Insurance that applies to any one of the coverages.

10. Two or More Policies.

    If two or more policies issued by us apply to the same insured and these policies also apply to the same loss, the maximum amount we will pay as damages under all the policies will not exceed the highest applicable Limit of Insurance that applies to any one of the policies.

    This does not apply to any policy issued by us that is specifically written as excess insurance.

11. Limitation of Coverage.

    If this Coverage Form is part of a policy which has other liability insurance, that other liability insurance does not apply to any injury caused by any "professional health care incident" covered by this Coverage Form.

****

**F.  EXTENDED REPORTING PERIODS**

1. We will provide the Extended Reporting Periods as described below if:

   a. This coverage form is cancelled or not renewed for any reason except nonpayment of premium; or

   b. We renew or replace this coverage form with insurance that;

      (1) Has a retroactive date later than the one shown in the Declarations Page of this policy; or

      (2) Does not apply to injury that arises out of a "Professional Health Care Incident" on a claims made basis.

2. Extended Reporting Periods do not extend the policy period, change the scope of coverage provided, or reinstate the Limits of Insurance. They apply only to "claims" for injury arising out of a "Professional Health Care Incident that occurred before the end of the policy period but not before the retroactive date, if any, shown in the Declarations Page.

3. A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for 60 days.

   "Claims" must be reported to us not later than 60 days after the end of the policy period in accordance with Senior Living Facility Professional Liability Conditions Subparagraphs 2.a. or 2.b. of this coverage form.

   The Basic Extended Reporting Period does not apply to "claims" that are covered under any subsequent insurance you purchase or that would be covered but for exhaustion of the amount of insurance applicable to such "claims."

4. A Supplemental Extended Reporting Period is available but only by endorsement and for an extra charge. This period starts after the end of the policy period.

   You must give us a written request for the endorsement within 60 days after the end of the policy period. The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due. We will determine the additional premium in accordance with our rules and rates. The premium will not exceed 200% of the annual premium for this coverage.

   The endorsement will include a provision to the effect that the insurance afforded for "claims" first received during the supplemental

Extended Reporting Period is excess over any other valid and collectible insurance available under policies in force after the Supplemental Extended Reporting Period starts.

Once in effect, the Supplemental Extended Reporting Period may not be cancelled.

5. "Claims" which are first received and recorded during the Basic Extended Reporting Period (or during the Supplemental Extended Reporting Period, if it is in effect) will be deemed to have been made on the last day of the policy period.

## G. DEFINITIONS

****

2. "Claim" means a "suit" or demand made by or for the injured person for monetary damages because of alleged injury to which this insurance applies.

****

5. "Professional health care incident" means:

a. Any act, error, omission or failure:

(1) In the furnishing of "professional health care services." This includes furnishing of food, beverages, medications or appliances in connection with such services;

(2) In the handling of deceased human bodies;

(3) Arising out of service by any persons as members of a formal accreditation, standards review or similar board of the Named Insured or as a person who executes the duties of such board.

b. Failure to comply with any right of a resident under any state or federal law regulating you as a resident health care facility;

c. Failure to protect any resident from undue influence by an insured when such undue influence is to the personal detriment of the resident.

Any such act, error, omission or failure, together with all related acts, errors, omissions or failures in the furnishing of "professional health care services" to any one person, shall be considered one "professional health care incident" subject to the Each Claim Limit of Insurance in force at the time the first

"professional health care incident" covered by this policy occurred.

6. "Professional health care employees" includes your professional employee(s) such as your nurses, student nurses, barbers, beauticians, and social workers.

7. "Professional health care services" means your professional medical, nursing, cosmetic, social, and similar professional services that relate to the care of your residents.

\*\*\*\*

9. "Suit" means a civil proceeding in which damages because of injury to which this insurance applies is alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

\*\*\*\*

**A 514 (5-89)**

## AMENDMENT - AGGREGATE LIMITS OF INSURANCE

This endorsement modifies insurance provided under the Professional Liability Coverage Part.

The following is added to the Professional Liability Coverage Part.

A. AMENDMENT - AGGREGATE LIMITS OF INSURANCE

   1. If a Coverage Form is designated in the Schedule of Coverage Forms, the Aggregate Limit of Insurance for that Coverage Form applies separately to each location as per the Schedule of Locations.

Refer to the Declarations Page to determine the Schedule of Coverage Forms and Schedule of Locations this endorsement applies to.

\*\*\*\*

**A 519 (09-07)**

## EXCLUSION - EXCLUDED OPERATION(S)

21

This endorsement modifies insurance provided under the Professional Liability Coverage Part.

The following is added for all coverages of the Senior Living Facility Professional Liability Coverage Form.

**A. EXCLUSION - EXCLUDED OPERATION(S)**

1. This insurance does not apply to injury caused by a "professional health care incident" to any person arising out of any excluded operation(s) shown in the applicable schedule of the Declarations Page.

Refer to the Declarations Page to determine the excluded operation(s).

\*\*\*\*

**A 940 (3-94)**

**ILLINOIS CHANGES**

This endorsement modifies insurance provided under the following:

**GENERAL LIABILITY COVERAGE PART**
**PROFESSIONAL LIABILITY COVERAGE PART**

The exclusion(s) for exemplary or punitive damages is deleted and replaced with the following:

This insurance does not apply to any exemplary or punitive damages except that if a suit shall have been brought against the insured with respect to a claim for acts or alleged acts falling within the coverage hereof, seeking both compensatory and punitive or exemplary damages, then the company will afford a defense to such action without liability, however, for such punitive or exemplary damages.

\*\*\*\*

**A 940.2 (10-13)**

**ILLINOIS CHANGES - DEFENSE COSTS**

This endorsement modifies insurance provided under the following:

\*\*\*\*

**GENERAL LIABILITY COVERAGE PART**
**PROFESSIONAL LIABILITY COVERAGE PART**

22

\*\*\*\*

A. The provisions of Paragraph B. below are added to all Insuring Agreements that set forth a duty to defend and apply to any other provision in the policy that sets forth a duty to defend.

B. If we initially defend an insured or pay for an insured's defense but later determine that none of the claims for which we provided a defense or defense costs are covered under this insurance, we have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement under this provision will only apply to the costs we have incurred after we notify you in writing that there may not be coverage and that we are reserving our rights to terminate the defense or the payment of defense costs and to seek reimbursement for defense costs.

\*\*\*\*

## THE CHURCH MUTUAL UMBRELLA POLICY

58.     Church Mutual issued Frontier Umbrella Policy number 0364899-81-129297, effective July 1, 2020 to July 1, 2021. A true and correct copy of the umbrella policy is attached as **Exhibit 7**.

59.     Form UMB 8301 (02-88) Change Endorsement lists The Auberge at Orchard Park and Welltower Tenant Group LLC as named insureds.

60.     The Umbrella Policy contains a $10,000 self-insured retention and a $5,000,000 limit.

61.     The Umbrella Policy only applies to the extent the primary policy applies and provides excess limits following the underlying insurance.

### COUNT I – DECLARATORY JUDGMENT
#### (Church Mutual Primary Policy claims-made Professional Liability Coverage Part)

62.     Church Mutual re-alleges and incorporates herein the preceding paragraphs as though fully set forth in this paragraph.

63.      The PLCP insuring agreement states:

b.  This insurance applies to injury only if:

****

(3) A "claim" for damages, with respect to the injury, is first made against any insured, in accordance with Paragraph c. below, during the policy period or an Extended Reporting Period we provide in accordance with Paragraph F. Extended Reporting Periods.

c.  A "claim" shall be considered to be first made at the earlier of the following times:

(1) When notice of such "claim" is received by any insured or reported to us in writing; or

d.  All "claims" made by the same person and arising out of the same "professional health care incident" will be deemed to have been made at the time the first of those "claims" is made against any insured.

64.     "Claim" means "a 'suit' or demand made by or for the injured person for monetary damages because of alleged injury to which this insurance applies."

65.     "Professional health care incident" means:

a.      Any act, error, omission or failure:

(1)     In the furnishing of "professional health care services." This includes furnishing of food, beverages, medications or appliances in connection with such services;
(2)     In the handling of deceased human bodies;
(3)     Arising out of service by any persons as members of a formal accreditation, standards review or similar board of the Named Insured or as a person who executes the duties of such board.

b.      Failure to comply with any right of a resident under any state or federal law regulating you as a resident health care facility;

c.      Failure to protect any resident from undue influence by an insured when such undue influence is to the personal detriment of the resident.

Any such act, error, omission or failure, together with all related acts, errors, omissions or failures in the furnishing of "professional health care services" to any one person, shall be considered one "professional health care incident" subject to the Each Claim Limit of Insurance in force at the time the first "professional health care incident" covered by this policy occurred.

24

66. As provided in Section E. Senior Living Facility Professional Liability Conditions, "[n]otice of a 'professional health care incident', is not notice of a 'claim.'"

67. "Suit" means a civil proceeding in which damages because of injury to which this insurance applies is alleged.

68. The PLCP extended reporting period provisions state:

**F. EXTENDED REPORTING PERIODS**

1. We will provide the Extended Reporting Periods as described below if:

   a. This coverage form is cancelled or not renewed for any reason except nonpayment of premium; or

   b. We renew or replace this coverage form with insurance that;

      (1) Has a retroactive date later than the one shown in the Declarations Page of this policy; or

      (2) Does not apply to injury that arises out of a "Professional Health Care Incident" on a claims made basis.

2. Extended Reporting Periods do not extend the policy period, change the scope of coverage provided, or reinstate the Limits of Insurance. They apply only to "claims" for injury arising out of a "Professional Health Care Incident" that occurred before the end of the policy period but not before the retroactive date, if any, shown in the Declarations Page.

3. A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for 60 days.

   "Claims" must be reported to us not later than 60 days after the end of the policy period in accordance with Senior Living Facility Professional Liability Conditions Subparagraphs 2.a. or 2.b. of this coverage form.

   The Basic Extended Reporting Period does not apply to "claims" that are covered under any subsequent insurance you purchase or that would be covered but for exhaustion of the amount of insurance applicable to such "claims."

4. A Supplemental Extended Reporting Period is available but only by endorsement and for an extra charge. This period starts after the end of the policy period.

You must give us a written request for the endorsement within 60 days after the end of the policy period. The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due. We will determine the additional premium in accordance with our rules and rates. The premium will not exceed 200% of the annual premium for this coverage.

The endorsement will include a provision to the effect that the insurance afforded for "claims" first received during the supplemental Extended Reporting Period is excess over any other valid and collectible insurance available under policies in force after the Supplemental Extended Reporting Period starts.

Once in effect, the Supplemental Extended Reporting Period may not be cancelled.

5.  "Claims" which are first received and recorded during the Basic Extended Reporting Period (or during the Supplemental Extended Reporting Period, if it is in effect) will be deemed to have been made on the last day of the policy period.

****

69.     Here, prior to filing a lawsuit, the Nedoss family retained an attorney and on January 14, 2021, the attorney sent Auberge a notice of attorneys' lien and demand to preserve evidence letter.

70.     The letter submitted to Church Mutual does not make a monetary demand.

71.     In response to that letter, Church Mutual retained defense counsel on behalf of Auberge to investigate and respond to Nedoss' attorney's records request.

72.     There is no insurance coverage under the PLCP because the January 2021 letter does not constitute a "claim".

73.     The October 15, 2021 lawsuit constitutes a "claim", however, there is no PLCP coverage because the lawsuit did not commence until after the policy expired on July 1, 2021 and past the 60-day basic extended reporting period in the PLCP.

74.     The underlying lawsuit does not explicitly request punitive damages, however, Form A 940 (3-94) Illinois Changes bars PLCP coverage for any exemplary or punitive damages.

75.     Form A 940.2 (10-13) Illinois Changes – Defense Costs states Church Mutual has the right to reimbursement for the defense costs incurred under the PLCP, and thus, Church Mutual seeks reimbursement of any and all defense costs incurred to defend Frontier, Auberge, and Welltower against the underlying lawsuit.

76.     As coverage is precluded under the primary policy's PLCP, Church Mutual has no duty to defend Frontier, Auberge, and Welltower with respect to the underlying lawsuit under the PLCP.

77.     As coverage is precluded under the primary policy's PLCP, Church Mutual has no duty to indemnify Frontier, Auberge, and Welltower with respect to the underlying lawsuit under the PLCP.

78.     Church Mutual alleges that coverage under the Church Mutual policy identified above may be barred or precluded, or limited by virtue of the provisions, exclusions, definitions, terms, conditions and limitations, including the applicable limits of liability and aggregate limits, deductibles, retentions and other provisions, limitations and exclusions contained in the Church Mutual policy. These policy provisions, exclusions, definitions, terms, conditions and limitations are too voluminous to itemize and are therefore incorporated by reference.

## COUNT II – DECLARATORY JUDGMENT
### (Church Mutual Umbrella Policy)

79.     Church Mutual re-alleges and incorporates herein the preceding paragraphs as though fully set forth in this paragraph.

80.     The Umbrella Policy only applies to the extent the primary policy applies and provides excess limits following the underlying insurance.

81.     Because there is no insurance coverage under the primary policy's PLCP, the Umbrella Policy does not provide insurance coverage.

82.     As coverage is precluded under the Umbrella Policy, Church Mutual has no duty to defend Frontier, Auberge, and Welltower with respect to the underlying lawsuit under the Umbrella Policy.

83.     As coverage is precluded under the Umbrella policy, Church Mutual has no duty to indemnify Frontier, Auberge, and Welltower with respect to the underlying lawsuit under the Umbrella Policy.

84.     Church Mutual alleges that coverage under the Church Mutual policy identified above may be barred or precluded, or limited by virtue of the provisions, exclusions, definitions, terms, conditions and limitations, including the applicable limits of liability and aggregate limits, deductibles, retentions and other provisions, limitations and exclusions contained in the Church Mutual policy. These policy provisions, exclusions, definitions, terms, conditions and limitations are too voluminous to itemize and are therefore incorporated by reference.

## **PRAYER FOR RELIEF**

WHEREFORE, Church Mutual requests judgment in its favor as follows:

1.      For a declaration that the Policies do not provide coverage for Defendants with respect to the underlying lawsuit;

2.      For a declaration that Church Mutual has no duty to defend Defendants or pay its defense expenses in connection with the underlying lawsuit;

3.      For a declaration that Church Mutual has no duty to indemnify Defendants or pay any judgment or settlement entered against it in the underlying lawsuit;

4.      Awarding Church Mutual reimbursement of the defense costs paid to defend Frontier, Auberge, and Welltower against the underlying lawsuit.

5.      For all attorney fees and costs incurred herein in pursuing this action; and

6.      Any other relief the Court deems just and equitable

## **DEMAND FOR JURY TRIAL**

Church Mutual demands a jury trial in this action.

Respectfully submitted,

Dated: January 11, 2023

CHURCH MUTUAL INSURANCE COMPANY, now known as Church Mutual Insurance Company, S.I.

By: _____s/Daniel I. Babetch_____

Daniel I. Babetch (Illinois # 6215723)
MEAGHER + GEER, P.L.L.P.
216 North Jefferson Street, Suite 100
Chicago, IL 60661
Tel: 312-463-1045
dbabetch@meagher.com

And

*Laura J. Hanson (MN#167575)(Pro Hac Vice Pending)*
*Danielle C. Dobry (MN#0399205) (Pro Hac Vice Pending)*
*MEAGHER + GEER, P.L.L.P.*
*33 South Sixth Street, Suite 4400*
*Minneapolis, MN 55402*
*Telephone: 612-338-0661*
*Facsimile: 612-338-8384*
*E-mail: lhanson@meagher.com*
        *ddobry@meagher.com*